## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

MAURICE ANDERSON,

Defendant.

Criminal Action No. TDC-21-0226

## MEMORANDUM OPINION

Defendant Maurice Anderson is charged with one count of assault with a dangerous weapon, in violation of 18 U.S.C. § 113(a)(3) (Count 1), and one count of possession of firearms and ammunition by a felon, in violation of 18 U.S.C. § 922(g)(1) (Count 2), based on an incident in which Anderson allegedly pointed a gun at other motorists while he was driving on the Baltimore-Washington Parkway in Maryland. Presently pending before the Court are Anderson's Motion to Dismiss Count Two, ECF No. 32, and Motion to Suppress Evidence Due to Illegal Detention Without Determination of Probable Cause, ECF No. 18. After briefing, the Court held a hearing on these and other motions on January 11, 2022. The Court held an additional hearing on the Motion to Dismiss Count Two on March 9, 2022. For the reasons set forth below, the Motion to Dismiss will be DENIED, and the Motion to Suppress will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

At the January 11, 2022 hearing, the Government presented the testimony of Officer Cameron Easter of the United States Park Police ("USPP") and other evidence, including body camera video recordings of multiple officers who responded to the scene of Anderson's arrest.

Based on the evidence presented at the hearing, the affidavit by Officer Easter filed in support of the criminal complaint which initiated this case, and other materials submitted with the Motions, the following facts are relevant to the resolution of these Motions.

## I.   Arrest and Detention

On Friday, May 28, 2021 at approximately 11:09 p.m., a motorist on the northbound side of the Baltimore-Washington Parkway near Beltsville, Maryland made a 911 call reporting that another driver in a gray Acura had pointed a pistol directly at him and his wife while the Acura was next to their car in slow-moving traffic. The gunman appeared to be saying something as he pointed the pistol, but the 911 caller and his wife could not hear what he was saying. Because the caller had provided the Acura's Virginia license plate number, Officer Easter, who was already in the area, identified the car and began following it as it drove on the right shoulder, passing other vehicles at a high rate of speed, then weaved through traffic. When the Acura pulled off the parkway and stopped at a gas station, Anderson emerged from the car, and Officer Easter approached him. Anderson had facial injuries that he said he had received in a bar fight. Although Anderson denied having any guns, a few minutes into the encounter, Officer Easter shined a light into the car and saw a gun on the floor of the car in front of the driver's seat. The gun was loaded. After Officer Easter secured the gun, and while he was briefing another officer on its recovery, Anderson stated, "There's another one in there, too." Downs Body Camera at 7:30, 1/11/22 Hrg. Ex. 1. The officers then recovered a second gun from the front passenger seat. Anderson was arrested at approximately 11:12 p.m.

After Anderson was arrested, Officer Easter took him first to the hospital to have his injuries treated and then to the Prince George's County Detention Center ("PGCDC") in Upper Marlboro, Maryland. Officer Easter testified that Anderson was taken to the PGCDC to be held

2

until he could have an initial appearance at the United States District Court in Greenbelt, Maryland. At the PGCDC, Officer Easter brought Anderson before a Maryland District Court Commissioner, who advised Anderson of his right to remain silent and his right to counsel. Officer Easter also completed a "hold paper" listing the charges on which the USPP was detaining Anderson and presented it to the Commissioner. 1/11/22 Hrg. Tr. at 30, ECF No. 64. The Commissioner, however, did not make a probable cause determination and just confirmed that USPP would arrange transport for Anderson to be taken to his initial appearance in federal court. Because the arrest occurred on the Friday night of Memorial Day weekend, Officer Easter knew that Anderson would not be seen in federal court until after the Monday holiday.

Because the United States District Court had a temporary policy of limiting criminal hearings to Mondays, Wednesdays, and Fridays due to the COVID-19 pandemic, Anderson was not brought to the federal court for an initial appearance until Wednesday, June 2, 2021. That same morning, an Assistant U.S. Attorney submitted to United States Magistrate Judge Gina L. Simms an affidavit by Officer Easter in support of a criminal complaint against Anderson. At 9:04 a.m. that day, Judge Simms determined that, based on the affidavit, probable cause existed, and she signed a criminal complaint against Anderson for assault with a dangerous weapon, in violation of 18 U.S.C. § 133(a)(3), and wearing, carrying, and transporting a handgun in a vehicle traveling on a public road, in violation of 18 U.S.C. § 13. After his initial appearance, Anderson was released pending trial on certain specified conditions.

Up to that point, Anderson had been consistently detained since his arrest the prior Friday evening for a total of 106 hours, or more than four days. While in detention, Anderson made 27 phone calls to family, friends, and others, with 14 occurring within the first 48 hours after he was detained and 13 occurring after that time period. All of these calls were recorded. In a recorded

3

message that is played before each call was connected, Anderson was told, "This call is from a corrections facility and is subject to monitoring and recording." *E.g.*, 5/30/21 7:58 p.m. Jail Call at 1:22–1:27, ECF No. 61-2.

## II.   Probable Cause Determinations

According to Officer Easter, USPP has no written policy on when and how to notify the U.S. Attorney's Office ("USAO") of a new arrest. USPP, however, has a standard practice of informing an Assistant U.S. Attorney ("AUSA") that someone has been taken into custody and will need to be presented in court and providing a description of the nature of the incident. The timing of the call depends on the nature of the incident. If it is late at night or USPP otherwise cannot consult an AUSA, the officer is aware of the charges on which the arrestee can be detained, and the officer believes that the arrestee should be detained as a flight risk or because the offense involves violent conduct, then the practice is to detain the arrestee and to contact the AUSA after the fact, some point before the next court session. However, if the officer needs to discuss what the applicable charges should be, or whether the arrestee should be detained, the officer contacts an AUSA immediately. Thus, the practice is that even when an arrestee is being detained until an initial appearance, there is no set time when USPP must call an AUSA so long as it occurs before the next court session.

According to the AUSA in this case, the USAO practice is to begin working on a criminal complaint and affidavit once the AUSA hears from a USPP officer that someone has been arrested without a warrant and then to present the affidavit and a proposed complaint to the United States magistrate judge during the initial appearance. Even if someone is arrested over a weekend, the USAO does not seek to present the affidavit and proposed complaint to a magistrate judge until the U.S. District Court reopens on Monday or the next business day. The AUSA acknowledged,

however, that the Court has a system in place under which a duty magistrate judge is always available, including at night and on weekends, to review and sign applications for arrest warrants and search warrants, and that the system is successfully utilized by the USAO for those matters. The AUSA also acknowledged that the Court has never told the USAO that the duty magistrate judge did not want to, or would not, process requests for a criminal complaint submitted at night or on weekends.

### III.    Prior Conviction

Prior to Anderson's arrest in this case, he had one criminal conviction. In 2008, Anderson pleaded guilty to wearing, carrying, or transporting a handgun on his person, in violation of the Criminal Law Article of the Maryland Code. Specifically, the statute states that absent one of several enumerated exceptions, "a person may not wear, carry, or transport a handgun, whether concealed or open, on or about the person." Md. Code Ann., Crim. Law § 4-203(a)(1)(i) (LexisNexis 2021). The exceptions include "wearing, carrying, or transporting of a handgun ... by a person to whom a permit to wear, carry, or transport the handgun has been issued" or "by a person on real estate that the person owns or leases or where the person resides." *Id.* §§ 4-203(b)(2), (6). A violation of this statute is a misdemeanor under state law, but a first offense is punishable by not less than 30 days and by up to three years of imprisonment. *Id.* § 4-203(c)(2)(i). A second offense is punishable by not less than one year and no more than 10 years of imprisonment. *Id.* § 4-203(c)(3)(i).

When he pleaded guilty, Anderson admitted to a statement of facts that provided that at the time of the incident, a citizen had reported to a police officer that a man sitting in a blue and yellow Ford Crown Victoria at a certain location had pointed a handgun at him. When the officer went to that location, he saw a vehicle matching the description with two occupants and four people

5

standing next to it. As the police officer exited his vehicle to approach the car, two of the people outside the car fled. Anderson, who was seated in the front passenger seat, then exited the Crown Victoria with his hands in his waistband. When the officer asked Anderson to take his hands out of his waistband, he attempted to run but tripped and fell to the ground. He then got into fetal position with his hands still in his waistband, and a semiautomatic handgun, with a round in the chamber and four rounds in the clip, fell from his waistband. Anderson was then arrested. Anderson did not have a permit to carry the firearm. During the guilty plea hearing, Anderson's attorney stated that although Anderson admitted to these facts, he was not admitting that he had actually pointed a handgun at another individual.

Anderson was sentenced to three years of imprisonment, with all but one year suspended, to be followed by three years of supervised probation. At the time of sentencing, he had already served 48 days in jail, and he was permitted to serve the remainder of his sentence on home confinement.

## DISCUSSION

### I.     Motion to Dismiss

In his Motion to Dismiss, Anderson seeks dismissal of Count 2, the charge of possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1), on the grounds that as applied to him, the charge violates his constitutional rights under the Second Amendment to the United States Constitution. Section 922(g)(1) provides that "[i]t shall be unlawful for any person … who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year … to … possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1) (2018). This provision does not apply when the prior conviction is "any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years

6

or less." 18 U.S.C. § 921(a)(20)(B). Because a federal crime punishable by a term exceeding one year is classified as a felony, § 922(g)(1) is essentially the federal law barring possession of firearms by felons. *See* 18 U.S.C. § 3559(a) (establishing the classes of federal felony and misdemeanor crimes based on the maximum term of imprisonment).

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the United States Supreme Court first held that the Second Amendment protects an individual's right to bear arms. *Id.* at 592. The Court, however, specified that the right is "not unlimited," that historically "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," and that historically most courts had held that "prohibitions on carrying concealed weapons were lawful under the Second Amendment." *Id.* at 626. In particular, the Court specifically stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," which are "presumptively lawful." *Id.* at 626–27 & n.26. Thus, based on this "presumptively lawful" language in *Heller*, the United States Court of Appeals for the Fourth Circuit has held that § 922(g)(1) is "constitutionally valid on its face," without drawing any distinction based on whether the prior conviction at issue is for a crime classified under state law as a felony or a misdemeanor. *United States v. Moore*, 666 F.3d 313, 319 (4th Cir. 2012). Every United States Court of Appeals has reached the same conclusion—that § 922(g)(1) is facially constitutional. *See id.* at 316–17 (collecting cases).

The Fourth Circuit has never upheld an as-applied Second Amendment challenge to § 922(g)(1). *See e.g.*, *Moore* 666 F.3d at 319–20 (rejecting an as-applied challenge by a criminal defendant with multiple prior felony convictions for robbery and assault with a deadly weapon who argued that he was carrying the firearm for protection); *United States v. Smoot*, 690 F.3d 215,

7

221–22 & n.8 (4th Cir. 2012) (rejecting an as-applied challenge to § 922(g)(1) from a criminal defendant with 16 prior convictions, including for assault on a police officer, who claimed to have the firearm for self-defense).  With one exception, the other United States Courts of Appeals have uniformly rejected as-applied Second Amendment challenges to § 922(g)(1).  *See, e.g.*, *Kanter v. Barr*, 919 F.3d 437, 438, 450 (7th Cir. 2019) (rejecting an as-applied challenge to § 922(g)(1) that was based on the fact that the challenger's predicate conviction was a non-violent mail fraud offense); *United States v. Phillips*, 827 F.3d 1171, 1173–74 (9th Cir. 2016) (rejecting an as-applied challenge to § 922(g)(1) that was based on the fact that the defendant's predicate conviction was misprision of a felony, a "non-violent, 'passive crime of inaction'"); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) (rejecting an as-applied challenge to § 922(g)(1) that was based on the claim that the charged possession did not involve violent intent); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) (rejecting an as-applied challenge to § 922(g)(1) that was based on the claim that the defendant possessed the handgun for self-defense only).  *But see Binderup v. Attorney General*, 836 F.3d 336, 356–57 (3d Cir. 2016) (upholding two as-applied Second Amendment challenges by plaintiffs whose sole convictions were state law misdemeanors).

In *Moore*, however, the Fourth Circuit left open the possibility that there could be a meritorious as-applied Second Amendment challenge to § 922(g)(1).  *See Moore*, 666 F.3d at 320 ("We do not foreclose the possibility that a case might exist in which an as-applied Second Amendment challenge to § 922(g)(1) could succeed.").  Such a challenge requires a showing that the individual's "factual circumstances remove his challenge from the realm of ordinary challenges."  *Id.* at 319.  The Fourth Circuit has not identified any particular circumstances under which such a challenge could succeed, but it has rejected as-applied challenges even where the individuals had entirely non-violent criminal records.  *See, e.g.. United v. Pruess*, 703 F.3d 242,

246–47 (4th Cir. 2012) (rejecting an as-applied challenge to § 922(g)(1) from a defendant with a non-violent criminal history but with multiple convictions for violations of firearms laws); *Hamilton v. Pallozzi*, 848 F.3d 614, 627 (4th Cir. 2017) (rejecting an as-applied challenge by an individual seeking a Maryland gun permit who had three prior felony convictions for non-violent theft and fraud crimes). Thus, whatever opening exists in the Fourth Circuit is a narrow one.

In considering as-applied Second Amendment challenges, the Fourth Circuit has adopted a two-prong test. Reflecting *Heller*'s finding that the Second Amendment codified a pre-existing right, the first prong asks "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee," which requires consideration of "whether the conduct at issue was understood to be within the scope of the right at the time of ratification." *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010). If not, the challenged law is valid. *Id.* If the law does impose such a burden, the court proceeds to step two, at which the Government must justify the constitutional validity of the law under the appropriate level of judicial scrutiny— here, intermediate scrutiny. *Id.* at 683 (applying intermediate scrutiny to a constitutional challenge to 18 U.S.C. § 922(g)(9), which bars firearm possession by individuals convicted of a misdemeanor domestic violence crime); *see also Harley v. Wilkinson*, 988 F.3d 766, 769 (4th Cir. 2021) (same).

The analysis at step one is more streamlined, however, when a presumptively lawful regulation is being challenged. *Moore*, 666 F.3d at 318. In such instances, the court "supplant[s] the historical inquiry with the more direct question of whether the challenger's conduct is within the protected Second Amendment right of 'law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Hamilton*, 848 F.3d at 624 (quoting *Heller*, 554 U.S. at 635); *see Pruess*, 703 F.3d at 245 (stating that "a presumptively lawful regulation could not violate the Second

9

Amendment unless, as applied, it proscribed conduct 'fall[ing] within the category of ... law-abiding responsible citizens ... us[ing] arms in defense of hearth and home'" (quoting *Moore*, 666 F.3d at 319)). Here, because the Fourth Circuit has deemed § 922(g)(1) to be such a presumptively lawful provision, *see Moore*, 666 F.3d at 317–19, the Court applies the streamlined two-prong test to determine whether the law is constitutional as applied to Anderson.

To satisfy the first prong, Anderson effectively must satisfy "two separate and independent inquiries," specifically, that at the time of his conduct—the firearm possession charged in Count 2—he was both a "law-abiding, responsible citizen" and that he was seeking to use the firearm "in defense of hearth and home." *See Hamilton*, 848 F.3d at 624 & n.7. Anderson fails both parts of this prong.

## A. Use in Defense of Hearth and Home

First, the Court finds that Anderson plainly fails to show that the use of the firearm for which he asserts his as-applied challenge is the constitutionally protected use of a firearm "in defense of hearth and home." *See id.* In many cases asserting an as-applied challenge, this requirement is easily satisfied because the case is a civil lawsuit filed before any firearm possession has occurred. In such instances, the plaintiff is generally seeking a declaratory judgment that the challenger may lawfully possess a firearm despite a prior criminal conviction, and the challenger has explicitly stated that the proposed use of the firearm is to provide protection within the challenger's home. *See, e.g.*, *id.* at 618, 624 (noting that there was "no dispute" that the challenger "intends to own arms 'in defense of hearth and home'"). *Cf. Corcoran v. Sessions*, 261 F. Supp. 3d 579, 595 (D. Md. 2017) (finding the "in defense of hearth and home" requirement satisfied in a case in which the plaintiff seeking the right to possess a gun for self-defense in his home asserted a Second Amendment as-applied challenge to a Maryland firearms statute).

10

In cases such as the present one, where a criminal defendant charged under § 922(g)(1) is asserting an as-applied constitutional challenge to the statute in order to void the charge or conviction, courts consider the circumstances of the alleged possession underlying the § 922(g)(1) charge to determine whether it constitutes possession "in defense of hearth and home." In *Pruess*, for example, the Fourth Circuit rejected an as-applied challenged by a defendant charged under § 922(g)(1) in part based on the fact that the defendant's "vast collection of weapons and explosives with clearly military purposes" demonstrated that the firearms and ammunition could not have been intended "in any substantial part, for 'defense of hearth and home.'" 703 F.3d at 246; *see also United States v. Kline*, 494 F. App'x 323, 325 (4th Cir. 2012) (in an as-applied challenge by a criminal defendant charged under § 922(g)(1) based on having purchased a gun from an undercover agent, rejecting the argument that there was "no reason to believe he intended to do anything but take home the firearm . . . and use it for self-protection" as "too vague and unsubstantiated"); *Smoot*, 690 F.3d at 222 (holding that the circumstances of the defendant's possession of a loaded revolver in the backyard of a residence that was either his residence or a "flop house" for drug use did "not distinguish his challenge from the typical application of § 922(g)(1)").

Here, the Government has alleged, consistent with the present record, that Anderson's possession occurred not at his home, but in his car, while he was driving on the Baltimore-Washington Parkway, and it took the form of Anderson allegedly pointing it at the occupants of another vehicle while they were in slow-moving traffic. The possession continued as Anderson drove to a nearby gas station, where Officer Easter found two guns in his car, at least one of which was loaded. Although Anderson argues that not all of these facts have yet been proven, where he seeks dismissal of the § 922(g)(1) charge before trial, not the vacating of a conviction after trial,

11

the Court appropriately considers whether the firearm possession as alleged by the Government implicates conduct protected by the Second Amendment. In any event, even if the Court considers only the facts of the firearm possession acknowledged by Anderson at the March 9, 2022 hearing— that the guns were found in his car shortly after he was driving on the Baltimore-Washington Parkway rather than at his home—it finds that the charged possession could not have been intended "in any substantial part, for 'defense of hearth and home.'" *Pruess*, 703 F.3d at 246. Indeed, Anderson has not even alleged, and there is no basis in the record to support a claim that, his possession was for the purpose of self-defense, whether in his home or elsewhere. *See Moore*, 666 F.3d at 319–20 (in rejecting an as-applied challenge by a criminal defendant charged under § 922(g)(1), noting that the core Second Amendment right is the use of a firearm "in defense of hearth and home" and noting that where the defendant was found with a firearm on a street and claimed that he carried the gun for self-defense because robberies were prevalent in his neighborhood, this reason was "far too vague and unsubstantiated to remove his case from the typical felon in possession case"). Because the charged possession does not implicate the constitutionally protected right to "to use arms in defense of hearth and home," and does not even involve possession for the purpose of self-defense more generally, Anderson's as-applied challenge fails at step one of the inquiry.

**B.      Law-Abiding and Responsible Citizen**

Second, even if that requirement were established, Anderson has also failed to establish that at the time of this possession, he was a "law-abiding, responsible citizen." *Heller*, 554 U.S. at 635. The Fourth Circuit confines its analysis of this issue to the challenger's criminal history. *Hamilton*, 848 F.3d at 626. "[E]vidence of rehabilitation, likelihood of recidivism, and passage of

12

time" since the conviction are not factors to be considered in determining if the challenger can be deemed to be within the class of "law-abiding, responsible" citizens. *Id.*

As to criminal history, a court is to consider only "the conviction or convictions causing the disability to the challenger." *Id.* Anderson argues that his lone conviction for the Maryland crime of wearing, carrying, or transporting a handgun on his person, Md. Code Ann., Crim. Law § 4-203(a)(1)(i), is so minor that his "sparse and non-aggravated criminal history" removes his challenge from ordinary § 922(g)(1) challenges. Mot. Dismiss at 2, ECF No. 32. The Fourth Circuit has not articulated a specific test for determining whether a prior conviction prevents someone from being deemed a law-abiding, responsible citizen, but its case law reveals several relevant considerations. First, the Fourth Circuit has held that any conviction for a crime labeled as a felony by the applicable sovereign necessarily excludes the challenger from the class of law-abiding citizens because the government has determined that "the crime 'reflects grave misjudgment and maladjustment.'" *Hamilton*, 848 F.3d at 626. As discussed above, the Fourth Circuit has left open the possibility that a person with a conviction for a crime labeled under state law as a misdemeanor, but carrying a maximum term of imprisonment of sufficient length to be covered by a "felon disarmament law" such as § 922(g)(1), could be deemed to be a law-abiding, responsible citizen, but it has yet to identify any such crime or person. *Id.* at 626 n.11. Thus, the universe of potential offenses is exceedingly limited.

Second, an offense of conviction need not have violence or the threat of violence as an element. *See id.* at 618, 627–28 (rejecting an as-applied challenge from an individual with felony convictions for credit card fraud, forgery, and theft charges who was never imprisoned and had no violent behavior). At the same time, a conviction for an offense that is "closely related to violent crime" or the potential for violence, such as certain violations of firearms laws, is more likely to

13

prevent someone from being a law-abiding, responsible citizen. *See Pruess*, 703 F.3d at 246 (finding that a defendant with multiple violations of firearms laws "undoubtedly flunk[ed] the 'law-abiding responsible citizen' requirement").

Third, a court properly considers both the elements of the offense of conviction and the facts and circumstances underlying the challenger's commission of that offense. *See, e.g.*, *id.* (in determining whether prior violations of firearms laws rendered the challenger outside the class of law-abiding, responsible citizens, considering the fact that the challenger had committed those violations with the belief that the firearms and ammunition were stolen); *Hamilton*, 848 F.3d at 627 (considering the loss amount arising from the challenger's prior convictions for theft, fraud, and forgery).

Here, the statute of conviction provides that absent one of several enumerated exceptions, "a person may not wear, carry, or transport a handgun, whether concealed or open, on or about the person," a crime punishable by up to three years of imprisonment. Md. Code Ann., Crim. Law § 4-203(a)(1)(i). Anderson argues that because this crime is classified as a misdemeanor under state law, it is essentially "a regulatory licensing offense that Maryland sentencing rules place in the least serious category of offenses" and equates it with what he characterizes as the "many misdemeanors that fall under § 922(g)(1)" that "are non-violent and reflect little in the way of serious culpability." Mot. Dismiss at 3, 7.

The Court disagrees. This statute includes Maryland's version of a prohibition on carrying concealed weapons, a restriction which the Supreme Court has stated was historically deemed lawful under the Second Amendment. *Heller*, 554 U.S. at 626. By providing numerous exceptions for conduct that would either be constitutionally protected, such as possessing a firearm in one's own residence, Md. Code Ann., Crim. Law § 4-203(b)(6), or which the State deemed to be

14

permissible, non-criminal conduct, such as transporting an unloaded firearm to engage in target practice, *id.* § 4-203(b)(4), the statute effectively focuses on carrying firearms in public areas without an identifiable, recognized purpose. Moreover, because Maryland may issue a permit to someone with a "good and substantial reason" to carry one but will not issue one to an individual who has a disqualifying conviction under state law, is presently an alcoholic, addict, or habitual user of illegal drugs, or has been shown after an investigation to have a propensity for violence or instability, the statute's prohibition on carrying a firearm without a permit is fairly deemed to be a measure focused on protecting public safety. Md. Code Ann., Pub. Safety § 5-306 (West 2022).

Notably, the legislative history of this statute provides that one of the purposes was to curb gun violence after an increase in handgun-related deaths and serious injuries in the early 1970s. *See Blue v. Prince George's Cnty.*, 76 A.3d 1129, 1135 (Md. 2013); *State v. Crawford*, 521 A.2d 1193, 1199 (Md. 1987). In light of "a dramatic increase in the number of crimes perpetrated with handguns and a concomitant increase in the number of deaths and injuries caused by persons carrying handguns on the streets," the statute and the permit requirements were adopted in part to "preserve the peace and tranquility of the State." *Crawford*, 521 A.2d at 1198–99. Because carrying a firearm in violation of this provision has the potential to result in violence and to otherwise implicate issues of public safety, Anderson's attempt to equate this offense to misdemeanors such as making annoying anonymous phone calls, improperly disposing of tire scrap for monetary gain, and selling a lottery ticket to a minor is entirely unpersuasive. Indeed, the fact that a first violation of this statute has a minimum sentence of 30 days of imprisonment, Md. Code Ann., Crim. Law § 4-203(c)(1)(i), both distinguishes it from some of these alleged comparators—which have no minimum sentence of imprisonment—and illustrates that it is not a mere "regulatory licensing offense." Mot. Dismiss at 3. The Court therefore does not agree with

15

Anderson that someone who violates this statute is properly considered a law-abiding, responsible citizen.

Further, the circumstances of Anderson's commission of the offense, which Anderson agrees are relevant and may be considered, illustrate that the conviction takes him outside the category of law-abiding, responsible citizens. The agreed-upon facts presented at Anderson's guilty plea hearing demonstrate that Anderson's possession was under volatile circumstances illustrating that it posed a risk to public safety—one of the original purposes of the statute. He was carrying a loaded gun, with a round in the chamber, while in a parked car among a group of people. Even accepting that the evidence did not establish, and Anderson denied, that he had pointed the gun at someone, there was a report that someone in his group had pointed a gun, and when a police officer arrived, Anderson ignored a request to show his hands and instead attempted to flee and to keep the firearm concealed on his person. As the sentencing judge told him, he was "a half a step away from injuring somebody else." 11/26/08 Sentencing Tr. at 5, Mot. Dismiss Ex. 2, ECF No. 32-2.

The conduct was sufficiently aggravated that Anderson received the maximum sentence of three years of imprisonment, and with suspended time he still received a one-year sentence to be served. While Anderson correctly notes that he was allowed to serve some of his time on home detention, that accommodation was provided after he had already served 48 days—a month and a half—of actual jail time while in pretrial detention. All of these circumstances demonstrate that the commission of this crime took Anderson out of the category of law-abiding, responsible citizens. This was not an instance of an individual who had acquired a firearm to protect his home and failed to unload it while transporting it to a repair shop or another residence, *see* Md. Code Ann., Crim. Law § 4-203(b)(3), or someone who had properly obtained a permit but inadvertently

16

let it expire, *see id.* § 4-203(b)(2), or other scenarios demonstrating a violation that could more credibly be argued to be consistent with the actions of a law-abiding, responsible citizen. Thus, even if there could be some violations of this statute that would not disqualify the perpetrator from being a "law-abiding and responsible" citizen, this was not one of them.

Anderson's citation to *Binderup v. Attorney General*, 836 F.3d 336 (3d Cir. 2016) (en banc), does not alter this conclusion. *Binderup* is the only case identified by either party or the Court in which a federal appeals court has upheld an as-applied Second Amendment challenge to § 922(g)(1). In *Binderup*, the United States Court of Appeals for the Third Circuit held that a challenger who had previously been convicted of the same Maryland offense at issue here, the crime of unlawfully carrying a handgun, Md. Code Ann., Crim. Law § 4-203, as well as another challenger convicted of the Pennsylvania misdemeanor of corrupting a minor, 18 Pa. Cons. Stat. § 6301(a)(1)(I) (2022), could still be deemed to be law-abiding, responsible citizens for purposes of an as-applied challenge. *Binderup*, 836 F.3d at 340. Where both sought declaratory judgments allowing them to obtain and possess firearms "in defense of hearth and home," the Third Circuit held that the Second Amendment protected their right to do so. *Id.* at 356–57.

Even though *Binderup* addressed the same Maryland misdemeanor statute at issue here, the Court declines to reach a comparable conclusion for several reasons. First, *Binderup*'s analysis does not comport with the Fourth Circuit's approach for assessing as-applied Second Amendment challenges. In *Binderup*, the Third Circuit held that to succeed on an as-applied challenge to § 922(g)(1), "a challenger must prove that he was not previously convicted of a *serious* crime," thus making the relevant inquiry at step one the seriousness of any prior convictions. *Id.* at 356 (emphasis added). Notably, the *en banc* court could not agree on the elements of this test, with the only formal articulation of it endorsed by only three judges and consisting of: (1) whether the

17

crime is classified as a misdemeanor or felony; (2) whether the crime involves violence; (3) the severity of the sentence imposed; and (4) whether there is cross-jurisdictional consensus regarding the seriousness of the crime. *Binderup*, 836 F.3d at 551–52; *see Hamilton*, 848 F.3d at 626 n.10. The Fourth Circuit, however, has explicitly declined to adopt *Binderup*'s "seriousness" test when presented with the opportunity to do so. *See Hamilton*, 848 F.3d at 626. Indeed, where the *Binderup* seriousness test allows for the possibility that a felony under state law could be deemed non-serious, such that an individual convicted of a felony could nevertheless be deemed law-abiding and responsible, the Third Circuit's approach conflicts with and is plainly more permissive than that of the Fourth Circuit, which has held that any felony conviction would render a challenger not law-abiding and responsible and has yet to identify any misdemeanor that would do so. *See id.*

Second, the circumstances of the prior conviction in *Binderup*, in which the challenger possessed the firearm while he was alone in his car at the time of a traffic stop and he was sentenced to only a 180-day suspended sentence, *Binderup*, 836 F.3d at 340, were distinctly less problematic than those of Anderson's prior conviction, described above, for which he received a three-year suspended sentence and served both actual jail time and home detention time.

Third and most importantly, unlike the plaintiff in *Binderup*, who brought a civil action seeking the right to obtain and possess a gun to be used for home protection, Anderson does not claim and has not shown that the possession for which he invokes Second Amendment rights—his possession of firearms on May 28, 2021 on or near the Baltimore-Washington Parkway—was "in defense of hearth and home," as required for a successful as-applied challenge, or even for purposes of self-defense of any kind. *See supra* part I.A; *Hamilton,* 848 F.3d at 624 & n.7

18

Because the firearm possession for which Anderson asserts his Second Amendment as-applied challenge was not "in defense of hearth and home," and he is not a law-abiding, responsible citizen, he fails at step one of the analysis. The Court therefore need not reach step two. The Motion to Dismiss Count Two will be denied.

## II.    Motion to Suppress

In his Motion to Suppress, Anderson asserts that his constitutional rights were violated because the USPP did not secure a judicial determination of probable cause until over four days after his arrest and detention. Based on that alleged constitutional violation, Anderson seeks suppression of the recorded jail calls he made while detained at the PGCDC. In opposing the Motion, the Government argues that there was no constitutional violation because the USPP, in compliance with Federal Rule of Criminal Procedure 5, brought Anderson before a state or local judicial officer within hours of his arrest, specifically the Commissioner at the PGCDC. The Government also argues that suppression of the recorded jail calls is not warranted because the Commissioner had advised Anderson of his right to remain silent, and because, where he was informed that the jail calls would be recorded, they were made voluntarily. The Government plans to introduce only four of the jail calls, specifically those made on the following dates and times: (1) Sunday, May 30, 2021 at 7:58 p.m.; (2) Monday, May 31, 2021 at 9:10 a.m.; (3) Tuesday, June 1, 2021 at 7:13 p.m.; and (4) June 1, 2021 at 7:33 p.m. The first call occurred in the first 48 hours after Anderson's arrest and detention; the remaining calls occurred after Anderson had been detained for 48 hours ("the post-48-hour calls"). Anderson seeks suppression of all of the calls.

### A.    Legal Standard

The Fourth Amendment ensures "[t]he right of the people to be secure … against unreasonable searches and seizures" and requires that "no Warrants shall issue, but upon probable

cause." U.S. Const. amend. IV. The Supreme Court has held that "the Fourth Amendment requires a timely judicial determination of probable cause as a prerequisite to detention." *Gerstein v. Pugh*, 420 U.S. 103, 126 (1975). This determination "must be made by a judicial officer either before or promptly after arrest." *Id.* at 125. It need not, however, be made at an adversarial proceeding with witness testimony; rather the determination may be made by a magistrate judge in the same manner that probable cause is found in order to issue an arrest warrant—in a non-adversarial proceeding based on written testimony and hearsay, such as through the presentation to a magistrate judge of an affidavit in support of a criminal complaint. *Id.* at 120.

In *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), the Court addressed the meaning of "promptly" by holding that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*." *Id.* at 56. A probable cause determination made in the first 48 hours could still violate *Gerstein*, but only if the individual can "prove that his or her probable cause determination was delayed unreasonably," such as if there was intentional delay "for the purpose of gathering additional evidence to justify the arrest," "a delay motivated by ill will against the arrested individual, or delay for delay's sake." *Id.* However, when an individual arrested without a warrant does not receive a probable cause determination within 48 hours, the government bears the burden to demonstrate "the existence of a bona fide emergency or other extraordinary circumstance" justifying the delay. *Id.* at 57. Intervening weekends do not qualify as an extraordinary circumstance, nor does a delay caused by an effort to consolidate pretrial proceedings. *Id.*

## B.      Fourth Amendment Violation

Here, it is undisputed that Anderson did not receive a probable cause determination within 48 hours of his arrest.  Though he was brought before a Commissioner within that time period, the Commissioner only advised Anderson of his right to remain silent and right to counsel and made no probable cause determination.  That determination did not occur until Judge Simms, based on Officer Easter's affidavit, issued a criminal complaint on the morning of June 2, 2021, more than four days after Anderson's arrest.  The Government argues that the delay did not violate the Fourth Amendment requirement of a prompt determination because the Government complied with the Rule 5(a) requirement that an arrestee be brought before a magistrate judge or state or local judicial officer "without unnecessary delay," Fed. R. Crim. P. 5(a), and that "[f]lexibility is a part of the process," particularly when the Court was closed over the three-day Memorial Day weekend and on the following Tuesday because of a modified schedule in response to the COVID-19 pandemic. Opp'n at 5–7, ECF No. 36.  Compliance with Rule 5(a), however, does not satisfy the *McLaughlin* requirement of a prompt probable cause determination because that rule addresses a different requirement—of an initial appearance at which the defendant is advised of the charges at issue, the right to remain silent, the right to counsel, and the circumstances under which the defendant may secure pretrial release.  *See* Fed. R. Crim. P. 5(a), (d).  The distinct requirement of a prompt probable cause determination is separately addressed in Rule 5(b), which requires that "[i]f a defendant is arrested without a warrant, a complaint meeting Rule 4(a)'s requirement of probable cause must be promptly filed in the district where the offense was allegedly committed."  Fed. R. Crim. P. 5(b).  That requirement was not met until four days after the arrest and appearance before the Commissioner.

21

The Government's claim that flexibility is required in light of the intervening holiday weekend and lack of court proceedings on Tuesday due to the COVID-19 pandemic fails because *McLaughlin* itself establishes that weekends and holidays do not constitute extraordinary circumstances justifying more than a 48-hour delay. *See McLaughlin*, 500 U.S. at 58–59 (finding that a county policy of determining probable cause at an arraignment hearing held within two business days of arrest was inadequate because under such a policy, the hearing would sometimes occur more than 48 hours after arrest when there were intervening weekends and holidays). Indeed, where the probable cause determination can be made by a magistrate judge upon consideration of an application for a criminal complaint, in the same way that an arrest warrant is considered, *see Gerstein*, 420 U.S. at 120, the fact that the district court was closed over the holiday weekend and was not holding criminal hearings on Tuesdays during the COVID-19 pandemic did not prevent the Government from securing a timely probable cause determination by using the established after-hours process for securing an arrest warrant from the duty magistrate judge. Because the Government has not met its burden to show extraordinary circumstances justifying the failure to obtain a probable cause determination within 48 hours of arrest, the Court finds that a *McLaughlin* violation occurred once 48 hours had passed.

At the same time, however, Anderson has not shown that in the first 48 hours of detention, the delay was unreasonable. There is no evidence that the failure to secure a probable cause determination in the first 48 hours was for the purpose of gathering sufficient evidence to justify the arrest, was motivated by ill will against Anderson, or was an intentional, deliberate step to delay such a determination. *See McLaughlin*, 500 U.S. at 57. The Court therefore finds that no Fourth Amendment violation occurred before the 48-hour mark.

22

## C.     Remedy

The Court must still address whether Anderson's requested remedy—suppression of the recorded jail calls—is warranted by the constitutional violation. Because the Court finds no Fourth Amendment violation arising from the failure to secure a probable cause determination within the first 48 hours after Anderson's arrest, there is no basis to suppress the May 30, 2021 jail call. Anderson nevertheless argues that the remaining calls must be suppressed as the fruit of the poisonous tree.

Neither the Supreme Court nor the Fourth Circuit has stated whether suppression of evidence is the appropriate remedy for a *McLaughlin* violation or how courts should determine whether particular evidence should be suppressed. *See McLaughlin*, 500 U.S. at 59 (remanding the case for further proceedings). Two United States Courts of Appeals have considered arguments seeking suppression of evidence following such a violation and concluded that even if suppression is an available remedy, it was not warranted under the specific facts of the case because the evidence at issue was secured before the detention had occurred or had become unlawful. *See United States v. Fullerton*, 187 F.3d 587, 591 (6th Cir. 1999) (finding that suppression of evidence was not warranted where the evidence at issue was obtained through a lawful search that occurred before the unlawfully prolonged period of detention began); *United States v. Forde*, No. 93-1322, 1994 WL 390143, at *3 (1st Cir. June 30, 1994) (unpublished) (same). Another court, in rejecting a defendant's claim that the remedy for a *McLaughlin* violation should be dismissal of the indictment, stated that even if there were some prejudice to the defendant from the delay, "the appropriate remedy would be suppression of the statements made during that period, not dismissal of the indictment." *United States v. Chavez*, 705 F.3d 381, 385–86 (8th Cir. 2013).

23

The United States Court of Appeals for the Ninth Circuit, however, has specifically concluded that suppression is an available remedy for a *McLaughlin* violation and that courts should apply a Fourth Amendment fruit of the poisonous tree analysis to determine whether suppression is appropriate. *See Anderson v. Calderon*, 232 F.3d 1053, 1071 (9th Cir. 2000) ("[W]e conclude that the appropriate remedy for a *McLaughlin* violation is the exclusion of the evidence in question—*if* it was 'fruit of the poisonous tree.'"), *overruled on other grounds by Bittaker v. Woodford*, 331 F.3d 715 (9th Cir. 2003). Under a fruit of the poisonous tree analysis, suppression of a statement is appropriate when the evidence at issue "was obtained by exploitation of the Fourth Amendment," but not if it was obtained "by means sufficiently distinguishable to be purged of the primary taint." *Calderon*, 232 F.3d at 1072 (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). Under such an analysis, courts would "not suppress evidence causally unrelated to the Fourth Amendment violation" but would protect the Fourth Amendment right to a prompt probable cause determination "by barring any exploitation of the delay that causally produces a statement." *Id.* In adopting this approach, the court noted that a *McLaughlin* violation arises under the Fourth Amendment, and that "suppression of evidence has been a preferred remedy for a Fourth Amendment violation" even while "it is not the automatic remedy for any such violation." *Id.* at 1071. The court also reasoned that allowing suppression under at least some circumstances is consistent with the purpose of the exclusionary rule, which is "the need, and the ability, to guide police conduct." *Id.*

The Court agrees with *Calderon* that suppression is an appropriate remedy for a *McLaughlin* violation and that fruit of the poisonous tree analysis is the proper mode of analysis. Particularly where in the present case, the Government has acknowledged that it has had no policy or practice of attempting to adhere to the timing requirements of *McLaughlin*, the exclusionary

rule must be available as a means to "guide police conduct" toward compliance with the constitutional rights of a defendant. *Calderon*, 232 F.3d at 1071. To allow the Government to use evidence gathered as result of an unconstitutionally lengthy detention with impunity would effectively reward the Government for such a violation. Conversely, applying suppression as a remedy would incentivize the Government to ensure compliance with this constitutional requirement. At the same time, as recognized in *Fullerton* and *Forde*, suppression of evidence not causally connected to the *McLaughlin* violation is unwarranted and inappropriate because it would not be sufficiently targeted to the protection of the constitutional right at issue. *See Calderon*, 232 F.3d at 1071; *Fullerton*, 187 F.3d at 591; *Forde*, 1994 WL 390143, at *3. Applying the fruit of the poisonous tree analysis strikes the appropriate balance.

Under such an analysis, where the evidence at issue is a statement by the defendant made during an unlawful detention, the statement is subject to suppression unless it "was sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 486 (1963); *see United States v. Watson*, 703 F.3d 684, 697 (4th Cir. 2013). In assessing this issue, courts must determine (1) "whether the statement was voluntary, not simply whether it occurred during the detention"; and (2) "whether it was either (a) the causal product of the violation, or (b) sufficiently an act of free will to delink it from the primary taint." *Calderon*, 232 F.3d at 1072. The factors to be considered in this analysis are: (1) the presence or absence of *Miranda* warnings; (2) the temporal proximity between the arrest and the statement; (3) the presence of any intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *See Brown v. Illinois*, 422 U.S. 590, 603–04 (1975); *Watson*, 703 F.3d at 697.

As to the first factor, it is undisputed that Anderson was advised of his *Miranda* rights when he was brought before the Commissioner. When this fact is coupled with the fact that

25

Anderson was informed that his phone calls would be recorded, it is fair to conclude that Anderson's statements were voluntary.  Voluntariness, however, is a "threshold requirement" and is not alone sufficient to purge the taint.  *See Brown*, 422 U.S. at 604.  Because a *McLaughlin* violation implicates the Fourth Amendment, rather than the Fifth Amendment, the presence of *Miranda* warnings or the voluntariness of the statement is not sufficient to avoid suppression.  *Calderon*, 232 F.3d at 1071–72; *see also Watson*, 703 F.3d at 697.  The Court must still assess whether the statements were the causal product of the violation.

As to the second factor, the calls made after Anderson had been detained for more than 48 hours without a probable cause determination were temporally proximate to the violation and fairly deemed to have been caused by it because once the 48-hour mark passed without the filing of a criminal complaint supported by probable cause, he should have been released.  Notably, in all four of the calls at issue, he referenced the fact that he had not yet been brought to federal court, and in two of those calls, he specifically complained about his prolonged detention and delay in receiving an initial appearance in federal court, including stating, "I feel like I'm losing it," "they ain't pick me up for court this morning," and "I don't know what is going on."  6/1/21 7:13 p.m. Jail Call at 2:00–2:23, 3:55–4:04, ECF No. 61-2.  Such statements suggest that Anderson may not have made these calls if he had not been detained for a prolonged period of time.  To the extent that Anderson would have had an interest in speaking to the same people he spoke to by telephone from the jail regardless of the length of his detention, those conversations would have occurred elsewhere and would not have been recorded had he been released after the Government failed to secure a prompt probable cause determination within 48 hours.  Thus, absent the violation, the evidence at issue—the recordings of those phone calls—would not have been generated and would not have been in the possession of the Government.

As for the third factor, the Government has not identified any intervening circumstances that broke the causal chain. The notice that Anderson's telephone calls would be recorded, though probative on the issue of voluntariness, does not provide an intervening circumstance that sufficiently demonstrated an act of free will that purged the taint of the violation because it does not demonstrate that Anderson would have affirmatively chosen to provide recorded evidence of his statements to the Government even absent the unconstitutional detention. In *Calderon*, the Ninth Circuit found that the defendant's confession, given after he had been detained for more than 48 hours without a probable cause determination, was sufficiently an act of free will that purged the taint of the violation only because of the "distinctive set of facts and circumstances" under which the defendant "*volunteered* a desire" to tell law enforcement about his involvement in an unrelated murder "soon after a lawful arrest" on a different charge and "while his detention was plainly legal." 232 F.3d at 1073. In fact, the evidence established that the defendant had a "pre-existing agreement" with others that he would "speak up and 'take the rap'" for the unrelated murder "if he ever got caught for some other crime" in order to exonerate others who had assisted after he escaped from prison, such that he had already decided to confess to that crime even before he was in police custody. *Id.* at 1073–75. The court therefore concluded that the defendant's confession during a period of unlawful detention was "causally unconnected" to that detention and was a case of a defendant who "decide[d] to confess as an act of free will unaffected by the initial illegality." *Id.* at 1075.

Here, in contrast, there is no evidence that before his arrest or before his detention became unlawful, Anderson had determined that he would provide to the police the statements he made in the post-48 hour calls. He never made any determination that he wanted to speak to law enforcement at all or that he wanted to provide a recording of his statements to the police; rather,

27

his statements were made to family and friends, and he had no choice over the means by which to communicate with them. Because of his unlawful detention extending beyond 48 hours, his only available means by which to speak to them was to use the recorded jail phone system. They were therefore "the causal product of the violation" and were not sufficiently "delink[ed] . . . from the primary taint" by any intervening circumstance. *Calderon*, 232 F.3d at 1072; *see Watson*, 703 F.3d at 697–98.

Finally, the flagrancy of the misconduct here favors suppression. From the testimony of Officer Easter and the statements of the Assistant United States Attorney at the January 11, 2022 hearing on the Motion, it is abundantly clear that there has been no policy or practice in this District of seeking a probable cause determination within 48 hours of a detention after a warrantless arrest, even though a duty magistrate judge is available at night and on weekends and holidays. Where the Government does not even attempt to comply with the constitutional requirement of *McLaughlin*, the violation is flagrant, and suppression is necessary to "guide police conduct" toward compliance with the constitutional rights of a defendant. *Calderon*, 232 F.3d at 1071.

For these reasons, the Court finds that the use of Anderson's post-48-hour calls would be an exploitation of the Fourth Amendment violation and that the calls must therefore be suppressed as the fruit of the poisonous tree. The Motion to Suppress will be granted as to those calls and denied as to the call made before Anderson had been detained for 48 hours.

## **CONCLUSION**

For the foregoing reasons, Anderson's Motion to Dismiss Count Two, ECF No. 32, will be DENIED, and Anderson's Motion to Suppress Evidence Due to Illegal Detention Without Determination of Probable Cause, ECF No. 18, will be GRANTED IN PART and DENIED IN PART, in that it will be granted as to the jail calls made after Anderson had been in detention for more than 48 hours and will be otherwise denied. A separate Order shall issue.

Date:   March 17, 2022

THEODORE D. CHUANG
United States District Judge

29